UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID PRYOR, | Case No. 1:21-cv-00709-CDB (SS) |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. §405(g) |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | (Docs. 14, 19) |

Plaintiff David Pryor ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits under the Social Security Act. (Doc. 1). The matter is currently before the Court on the parties' briefs, which were submitted without oral argument. (Docs. 14, 19). Upon review of the Administrative Record ("AR") and the parties' briefs, the Court finds and rules as follows.

## I.    BACKGROUND

### A. Administrative Proceedings and ALJ's Decision

On June 15, 2018, Plaintiff filed a Title II application for disability insurance benefits and Title XVI application for supplemental security income. (AR 200-203). Plaintiff's application was denied and, after reconsideration, was denied again. (AR 99-106, 121-124). Plaintiff then filed a

1   request for a hearing before an Administrative Law Judge ("ALJ").  (AR 125-126).  On July 6,

2   2020, the assigned Administrative Law Judge ("ALJ"), Bryan Henry, held a hearing; Plaintiff and

3   his counsel attended as did vocational expert Douglas Prutting.  (AR 44-72).  The ALJ issued his

4   decision on August 26, 2020, finding Plaintiff not disabled.  (AR 25-38).  On December 18, 2020,

5   the Appeals Council found no basis for changing the ALJ's decision.  (AR 11-16).

6   　　　In his decision, the ALJ used the five-step sequential evaluation process promulgated by

7   the Social Security Administration for determining whether an individual is disabled.  (AR 26)

8   (citing 20 C.F.R. § 404.1520a).  The ALJ found that Plaintiff met the insured status requirements

9   of the Social Security Act through December 31, 2023, and that he had not engaged in substantial

10  gainful activity since June 13, 2018, the alleged onset date.  (AR 27).  The ALJ concluded that

11  Plaintiff had the following severe impairments: schizoaffective disorder, generalized anxiety

12  disorder, intermittent asthma, allergies, and obesity.  He noted that Plaintiff also had the following

13  non-severe impairments: lumbar disc excision and obstructive sleep apnea.  After identifying these

14  impairments, the ALJ found that Plaintiff did not have an impairment, or any combination of

15  impairments, that meets or medically equals the severity of one of the listed impairments in 20

16  C.F.R. Part 404, Subpart P, Appendix 1.  (AR 28).

17  　　　The ALJ reached this determination by considering the four broad functional areas of

18  mental functioning listed in the "paragraph B" criteria.[1]  The first functional area is

19  understanding, remembering, or applying information. The ALJ found that Plaintiff has a mild

20  limitation.  The ALJ supported his finding by noting Plaintiff struggled with memory and

---

21  　　　[1] The "paragraph B criteria" evaluates mental impairments in the context of four broad areas of

22  functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3)
    concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. § Pt. 404,

23  Subpt. P, App. 1.  The severity of the limitation a claimant has in each of the four areas of functioning is
    identified as either "no limitation," "mild," "moderate," "marked," or "extreme."  *Id.*  To satisfy the

24  paragraph B criteria, a claimant must have an "extreme" limitation in at least one of the areas of mental
    functioning, or a "marked" limitation in at least two of the areas of mental functioning.  *Id.*  An "extreme"

25  limitation is the inability to function independently, appropriately, or effectively, and on a sustained
    basis.  *Id.*  A "marked" limitation is a seriously limited ability to function independently, appropriately, or

26  effectively, and on a sustained basis.  *Id.*  A "moderate" degree of mental limitation means that functioning
    in this area independently, appropriately, effectively, and on a sustained basis is "fair."  *Id.*  And a "mild"

27  degree of mental limitation means that functioning in this area independently, appropriately, effectively,
    and on a sustained basis is "slightly limited."  *Id.*; *see Carlos v. Comm'r of Soc. Sec.*, 1:21-cv-00517-SAB,

28  2023 WL 1868870, at n.7 (E.D. Cal. Feb. 9, 2023).

instructions and used alarms to take medications and go places.  On the other hand, he drove himself, prepared meals, shopped in stores, and handled his finances.  (AR 29).  In the functional area of interacting with others, the ALJ found that Plaintiff has a moderate limitation.  The ALJ supported this determination by noting that Plaintiff had difficulty interacting with "people at work, and while he used to go bowling, he had not done that in a long time."  The ALJ added, "[o]n the other hand, he shopped at stores, indicating an adequate ability to be in public and to engage in cursory interactions with others … [and] the medical evidence shows that the claimant was described as pleasant and cooperative, and had good interactions with medical staff."  *Id.* (citations omitted).

The third functional area is concentrating, persisting, or maintaining pace, for which the ALJ found Plaintiff has a moderate limitation.  The ALJ cited Plaintiff's "problems with concentration, noting he could [not] pay attention for very long, and usually was not able to finish what he starts."  On the other hand, Plaintiff "wrote he prepared simple meals, shopped in stores for groceries and supplies, and completed household chores including cleaning, doing laundry, and household repairs.  Additionally, he drove a car, indicating an ability to maintain attention and concentration while operating a motor vehicle."  *Id.* (citations omitted).

The fourth functional area is adapting or managing oneself, for which the ALJ found that Plaintiff has a mild limitation.  The ALJ noted that Plaintiff had "difficulty with handling stress and changes in routine.  On the other hand, he had no problem with personal care activities, and he was able to prepare simple meals, perform household chores, drive, shop in stores, and handle money."  These activities "indicate[] he can set realistic goals, make plans independently of others, manage his emotions and act appropriately in public places, be aware of normal hazards, and take appropriate precautions."  The ALJ stated that, in finding such limitations, he consulted the assessments of state agency psychologist Phaedra Caruso-Radin and physician B. Young, finding them persuasive.  *Id.* (citations omitted).

The ALJ found that the "paragraph C" criteria were also not met because "the evidence does not establish both (1) ongoing medical treatment, mental health therapy, psychosocial support or a highly structured setting that diminishes the symptoms and signs of the claimant's

1    mental disorder and (2) minimal capacity to adapt to changes in the claimant's environment or to

2    demands that are not already part of the claimant's daily life."  (AR 30).

3          The ALJ determined the following residual functional capacity ("RFC"):

4          After careful consideration of the entire record, the undersigned finds that the
5          claimant has the residual functional capacity to perform a full range of work at all
           exertional levels but with the following nonexertional limitations: the claimant can
6          never climb ladders, ropes, or scaffolds.  He should only occasionally have
           exposure to fumes, odors, and/or irritants.  He should never work at unprotected
7          heights or around moving and/or dangerous machinery.  He is limited to simple,
           routine, repetitive tasks.  He can have occasional contact with the public,
8          coworkers, and supervisors.  He is capable of completing simple instructions, such
9          as simple, routine, repetitive tasks, and can follow directions, without additional
           assistance.  He is able to maintain adequate attention, concentration, persistence,
10         and pace, as needed to complete a full workday, or workweek, with normal breaks.
           He can deal with changes in a routine work setting, on an occasional basis.

11

12   *Id.*  After summarizing the medical evidence, the ALJ found that the Plaintiff's impairments could

13   reasonably be expected to cause some of his alleged symptoms but the intensity, persistence, and

14   limiting effects of those symptoms were not consistent with the medical evidence in the record.

15   (AR 31).

16         The ALJ reasoned as follows:

17         During the period under review, the claimant engaged in a number of activities that
           are not consistent with the severity of the reported symptoms and undercut a finding
18         of total disability.  While the record reports issues with motivation, there is also
           discussion of the claimant spending time outside caring for the yard, exercising
19         regularly, and doing projects such as fixing a drawer, and completing a shed in his
           yard.  Additionally, the claimant has reported that he is usually active and completes
20         different projects around the house.  In terms of socializing with others, the record
           notes the claimant is often solitary, but goes out to restaurants, and in January 2020,
21         he reported he and his mother visited his aunt in Phoenix.  The claimant's ability to
           travel from California to Arizona, also suggests an adequate ability to have at least
22         cursory interactions with others and also adapt to new locations, as well as changes
23         in routines.  Overall, the claimant's activities and the medical evidence are not
           entirely consistent with the severity of the claimant's allegations.

24

25   (AR 32) (citations omitted).

26         After summarizing the medical evidence of record regarding Plaintiff's psychological

27   symptoms and impairments (AR 32-33), the ALJ addressed the medical opinions of record.  He

28   found the prior administrative findings of Drs. Caruso-Radin and Young to be persuasive as to

                                              4

Plaintiff's psychological impairments.   In support, the ALJ noted Plaintiff's response to medications, his mood and manner in a mental status examination in January 2020, and his daily activities.   He found that the administrative findings of state agency medical consultant physicians B. Vaghaiwalla and Robin Rosenstock regarding Plaintiff's physical conditions were not persuasive, finding it "prudent to impose additional limitations" in the RFC due to Plaintiff's obesity, history of suicidal ideation, asthma, and allergies.   (AR 35).

As to the two opinions from Plaintiff's psychiatrist, Dr. Nolan Thompson, the ALJ found them unpersuasive.   The ALJ explains as follows:

> However, Dr. Thompson's responses set forth no specific work related [sic] functional limitations, cite no objective findings, and rely heavily on the claimant's subjective reports. For example, on the October 2018 form, rather than citing mental status findings, Dr. Thompson relies on the reports of the claimant that his mother helps him with providing reminders and with directing him and doing chores.
>
> Beyond this, Dr. Thompson's opinions are not persuasive because similar symptoms of paranoia, suicidal ideation, and difficulty interacting with others in the workplace, appear in the record while the claimant was working before the June 2018 alleged onset date.  For example, worsening paranoia was noted in December 2017 and constant paranoia was noted in March 2018.  There are also regular reports of fleeting suicidal ideation in January, March, and April 2018.  Likewise, the record also notes problems with coworkers while the claimant was working.  As such, the existence of these symptoms after the alleged onset date does not show an inability to engage in substantial gainful activity.
>
> Moreover, some of the claimant's issues seem to result from lack of structure after he stopped working.  For example, in October 2018, the claimant noted lethargy and signs of apathy, as well as getting little done during the day.  However, this was attributed to not having work to structure his day, and the record discusses ways the claimant could organize his day and schedule tasks, exercises, and activities to better focus his energy.
>
> Most importantly, neither of Dr. Thompson's opinions addresses the improvement in the claimant's symptoms after starting Navane in December 2018.  By April 2019, the claimant reported his paranoia was "a whole lot better."  When Navane was unavailable, the claimant continued to do well on Haldol.  Once restarted on Navane around January 2020, the claimant reported improved mood and "very minimal" paranoia.  Additionally, the record reflects the claimant spending more time outside his house and caring for the yard, fixing a drawer, going out to restaurants, exercising regularly, and noting that he is usually active and completes different projects around the house.  Moreover, in January 2020, he and his mother visited his aunt in Phoenix.  Likewise, a mental status exanimation in January 2020

1

showed no abnormalities with behavior, manner, or appearance, normal speech, a
euthymic mood and congruent affect, logical and linear thought process, no suicidal
ideation, grossly intact memory and concentration, and the claimant was alert and
oriented to person, place, time, and situation, had good insight, unimpaired
judgment and impulse control.  Accordingly, neither of Dr. Thompson's opinions
is consistent with his own records, or supported by other evidence including the
claimant's activities.

(AR 34-35) (citations omitted).

The ALJ determined that Plaintiff was unable to perform any past relevant work and was a

younger individual on the alleged date of onset, as defined in 20 C.F.R.§ 404.1563.  The ALJ found

that there are jobs existing in significant numbers in the national economy that Plaintiff could

perform.  (AR 36).  The ALJ cited to floor tech, assembler – small products, and mail clerk, non-

postal, based on testimony of the vocational expert.  The ALJ concluded that Plaintiff has not been

under a disability from June 13, 2018, through to the date of the decision.  (AR 37).

### B.  Medical Record and Hearing Testimony

The relevant hearing testimony and medical record were reviewed by the Court and will be

referenced below as necessary to this Court's decision.

## II.    STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is

governed by 42 U.S.C. § 405(g).  The scope of review under § 405(g) is limited; the

Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is

based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence"

means "relevant evidence that a reasonable mind might accept as adequate to support a

conclusion."  (*Id*. at 1159) (quotation and citation omitted).  Stated differently, substantial evidence

equates to "more than a mere scintilla[,] but less than a preponderance."  (*Id*.) (quotation and

citation omitted).  "It is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Healy v. Astrue*, 379 Fed. Appx. 643, 645 (9th Cir. 2010).  In determining

whether the standard has been satisfied, a reviewing court must consider the entire record as a whole

rather than searching for supporting evidence in isolation.  (*Id*.).

The court will review only the reasons provided by the ALJ in the disability determination

and may not affirm the ALJ on a ground upon which she did not rely.  Social Security Act § 205, 42 U.S.C. § 405(g).  In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner.  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  Further, a district court will not reverse an ALJ's decision on account of an error that is harmless.  (*Id.*).  An error is harmless where it is "inconsequential to the [ALJ's] ultimate nondisability determination."  (*Id*). (quotation and citation omitted).  The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed.  *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

A claimant must satisfy two conditions to be considered "disabled" and eligible for benefits within the meaning of the Social Security Act.  First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  Second, the claimant's impairment must be "of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria.  *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).  At step one, the Commissioner considers the claimant's work activity.  20 C.F.R. § 416.920(a)(4)(i).  If the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled.  20 C.F.R. § 416.920(b).

If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two.  At this step, the Commissioner considers the severity of the claimant's impairment.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three.  20 C.F.R. § 416.920(c).  If the claimant's impairment does not

satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled. (*Id.*).

At step three, the Commissioner compares the claimant's impairment to impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment is as severe or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits. 20 C.F.R. § 416.920(d).

If the severity of the claimant's impairment does not meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity." Residual functional capacity (RFC), defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations (20 C.F.R. § 416.945(a)(1)), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past (past relevant work). 20 C.F.R. § 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 416.920(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. § 416.920(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education, and past work experience. (*Id.*). If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 416.920(g)(1). If the claimant is not capable of adjusting to other work, the analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits. (*Id.*).

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the analysis proceeds to step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy." 20 C.F.R. § 416.960(c)(2); *Beltran*

1    *v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

2    **III.     ISSUES AND ANALYSIS**

3        Plaintiff seeks judicial review of the Commissioner's final decision denying his application.

4    (Doc. 1).  Plaintiff raises the following issues:

5        1.  The mental RFC ("MRFC") is not supported by substantial evidence (Doc. 14 at 2); and

6        2.  The ALJ harmfully erred by failing to provide "clear and convincing" reasons to reject

7            the symptomology evidence of record.  *Id.*

8        **A.  Whether the MRFC Is Not Supported by Substantial Evidence**

9        An ALJ's decision, including the decision to discredit any medical opinion, must be

10   supported by substantial evidence.  *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).  The

11   regulations set "supportability" and "consistency" as "the most important factors" when

12   determining an opinion's persuasiveness.  20 C.F.R. § 404.1520c(b)(2).  The ALJ must "articulate

13   how [they] considered the medical opinions" and "how persuasive [they] find all of the medical

14   opinions." 20 C.F.R. § 404.1520c(a)–(b).  In conjunction with this requirement, "[t]he agency must

15   'articulate ... how persuasive' it finds 'all of the medical opinions' from each doctor or other source,

16   and 'explain how [it] considered the supportability and consistency factors' in reaching these

17   findings." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(b)).  "Supportability means the

18   extent to which a medical source supports the medical opinion by explaining the 'relevant ...

19   objective medical evidence.'" *Id.* at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)).  "Consistency

20   means the extent to which a medical opinion is 'consistent ... with the evidence from other medical

21   sources and nonmedical sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

22       Plaintiff asserts that the MRFC is not supported by substantial evidence.  He argues that the

23   ALJ based the MRFC on the opinions of the state agency physicians' opinions and improperly

24   rejected the MRFC assessments of Dr. Thompson.  Specifically, Plaintiff contends that the ALJ

25   based the MRFC on the state physicians' opinions regarding Plaintiff's "good response to

26   medications" and "stable findings" with an "ability to complete different projects around the

27   house."  (Doc. 14 at 9) (citing AR 35).  Plaintiff notes that, in contrast, Dr. Thompson found

28   Plaintiff had disabling levels of limitation given his extreme paranoia, suicidal ideation, impaired

9

1    concentration, and lack of ability to function independently, as well as a likelihood that Plaintiff

2    would have over four unplanned absences per month.  *Id.* (citing AR 329-330, 551-555).  Plaintiff

3    argues that the ALJ harmfully erred by "cherry picking" parts of the record, "in order to

4    mischaracterize Dr. Thompson's records with his [] findings."  *Id.* at 10.

5        Defendant argues that substantial evidence supports the ALJ's findings and that he properly

6    assessed the factors of supportability and consistency.  Defendant notes that the ALJ cited to the

7    record when determining that Dr. Thompson's responses lacked discussion of objective findings

8    and relied heavily on Plaintiff's subjective complaints.  Regarding consistency, Defendant provides

9    that the ALJ properly observed that Plaintiff was able to engage in substantial gainful activity until

10   2018, despite reporting longstanding mental health symptoms since 2004, and that medication was

11   effective in treating his symptoms.  Defendant points out that the ALJ further noted that Plaintiff's

12   daily activities were inconsistent with Dr. Thompson's assertions of disability.  (Doc. 19 at 5-8).

13       In finding Dr. Thompson's opinions "not persuasive," the ALJ provided that they "set forth

14   no specific work related [sic] functional limitations, cite no objective findings, and rely heavily on

15   the [Plaintiff]'s subjective reports."  The ALJ reasoned that "similar symptoms of paranoia, suicidal

16   ideation, and difficulty interacting with others in the workplace, appear in the record while the

17   [Plaintiff] was working before the June 2018 alleged onset date," as well as "problems with

18   coworkers" and it follows that the existence of such symptoms after the onset date does not show

19   an inability to engage in substantial gainful activity.  The ALJ assessed that "some of [Plaintiff]'s

20   issues seem to result from lack of structure after he stopped working," citing notes from a clinical

21   visit in October 2018.  (AR 34).  Lastly, the ALJ asserted that Dr. Thompson's opinions do not

22   address the "improvement in the [Plaintiff]'s symptoms after starting Navane in December 2018."

23   The ALJ noted that Plaintiff had improved paranoia in April 2019 and, when Navane became

24   unavailable, Plaintiff continued to do well on Haldol.  Once restarting Navane in January 2020, the

25   ALJ noted that Plaintiff reported improved mood and minimal paranoia, as well as a relatively wide

26   array of daily activities.  The ALJ concluded that Dr. Thompson's opinions were inconsistent with

27   his own records and unsupported by other evidence.  (AR 35).

28   ///

i.      *Dr. Thompson's Opinions*

Dr. Thompson's opinions are contained in two separate exhibits in the administrative record.  The first is a mental disorder questionnaire form, dated October 23, 2018, and signed by Dr. Thompson.  (AR 551-555).  Dr. Thompson represents that Plaintiff is experiencing "anxiety, depressed mood, [and] impaired concentration and memory" with onset 18 months ago and steadily worsening.  He quotes Plaintiff, stating "'anxiety, trouble sleeping, want to cry, I lack confidence; I feel like my employer is spying on me.'"  (AR 551).  Dr. Thompson provides that Plaintiff was hospitalized on January 1, 2004, and June 13, 2018, both times for suicidal ideation.  *Id.*  He notes "chronic work problems due to impaired functioning," with "good attitude, pleasant manner, anxious, restless, fidgeting of hands and fingers," as well as Plaintiff being "oriented to person, place, time, situation[;] paranoid ideation of being 'spied on'[;] [i]mpaired concentration and memory."  (AR 552).  Dr. Thompson states that Plaintiff has "frequent suicidal ideation and paranoia."

As to current level of function, Dr. Thompson provides that Plaintiff has good hygiene and grooming, his mother helps him by directing him regarding chores for home maintenance, as well as doing the shopping, and his daily activities have decreased due to his mental condition.  (AR 553).  As to Plaintiff's limitations, Dr. Thompson proffers that he has severe impairments with coworkers due to anxiety and paranoid ideation, an impaired ability to sustain attention and complete everyday household routines, and impaired decision-making and interaction with supervisors and coworkers.  (AR 554).  Finally, Dr. Thompson asserts that Plaintiff's condition is "not expected to improve significantly.  He is completely disabled."  (AR 555).

The second opinion from Dr. Thompson that the ALJ evaluated is a mental impairment questionnaire dated and signed May 21, 2020.  (AR 329-330).  It is primarily a checkbox-style form.  Dr. Thompson marks "sedation" and "fatigue" as negative side effects from medications that may affect Plaintiff when working.  He marks "[u]nderstanding information," "[r]emembering information," and "[a]pplying information" with "[m]oderate" limitation.  He marks "[i]nteracting with others," "[c]oncentrating," "[p]ersisting," and "[m]aintaining pace," with "[m]arked" limitation.  He marks "[a]dapting in the workplace" and "[m]anaging oneself in the workplace"

with "[e]xtreme" limitation.  (AR 329).  Dr. Thompson marks that Plaintiff's neurocognitive disorder is chronic, serious, and persistent; that Plaintiff relies on ongoing medical treatment, therapy, psychosocial support, or a highly-structured setting to diminish the symptoms; and that, despite Plaintiff's diminished symptoms, Plaintiff has only marginal adjustment, meaning a minimal capacity to adapt to changes in his environment or demands not already a part of his daily life.  Dr. Thompson marks that Plaintiff would likely be absent from work about four, or more than four, days per month, his impairment can be expected to last longer than 12 months, and his impairments are reasonably consistent with the symptoms and limitations described in the questionnaire.  (AR 330).

As a preliminary matter, the ALJ may properly reject Dr. Thompson's conclusion as to the Plaintiff's disability status.  *See* 20 C.F.R. § 404.1527(d) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability … A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").  As such, the ALJ need not consider Dr. Thompson's conclusion in his mental disorder questionnaire form that Plaintiff was "completely disabled."  (AR 555).

### ii.    *Functional Limitations*

In deeming Dr. Thompson no persuasive, the ALJ reasoned that his opinions "set forth no specific work related [sic] functional limitations, cite no objective findings, and rely heavily on the [Plaintiff]'s subjective reports" and that "some of [Plaintiff]'s issues seem to result from lack of structure after he stopped working," citing notes from a clinical visit in October 2018.  (AR 34) (citing AR 523).

"[T]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).  An ALJ may discredit physicians' opinions that are unsupported by the record as a whole.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).

First, Dr. Thompson's opinions do, in fact, evidence limitations that relate, both directly

1    and indirectly, to work.  (*See* AR 329, 554).  Second, though Dr. Thompson's opinions as to mental

2    limitations were provided in "check-box" forms and the ALJ is technically correct in noting that

3    the forms do not cite objective findings, they are consistent with hundreds of pages of treatment

4    notes in the record, created in the course of the relationship between Plaintiff and Dr. Thompson.

5    It follows that the opinions are supported by clinical findings.  *See Garrison v. Colvin*, 759 F.3d

6    995, 1014 & n.17 (9th Cir. 2014) (holding that ALJ may not reject medical opinion merely because

7    it was memorialized in check-box forms that "reflected and were entirely consistent with the

8    hundreds of pages of treatment notes created [by the doctors]").

9        Regarding subjective reports, a "physician's opinion of disability premised to a large extent

10   upon the claimant's own accounts of his symptoms and limitations may be disregarded where those

11   complaints have been properly discounted."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595,

12   602 (9th Cir. 1999) (internal quotations and citation omitted).  However, the Ninth Circuit has

13   explained that this rule does not apply in the same manner to opinions regarding mental illness.

14   *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (finding that the consultative examiner's

15   partial reliance on the plaintiff's self-reported symptoms was not a reason to reject his opinion).

16   "Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical

17   fields.  Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's

18   observations of the patient."  *Id.* (citation omitted).

19       Additionally, an ALJ does not provide legally sufficient reasons "for rejecting an examining

20   physician's opinion by questioning the credibility of the patient's complaints where the doctor does

21   not discredit those complaints and supports his ultimate opinion with his own observations."  *Ryan*

22   *v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) (citations omitted); *see*

23   *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999) (finding that

24   neither psychologist should be faulted for believing plaintiff's complaints where neither found any

25   indication the plaintiff was malingering or deceptive).

26       The Court concludes that the ALJ erred by improperly rejecting the psychiatric and

27   psychological medical opinions of record as lacking support from objective findings and as based

28   on Plaintiff's self-reports.

### iii.    *Onset Date*

The ALJ asserts that "similar symptoms of paranoia, suicidal ideation, and difficulty interacting with others in the workplace, appear in the record while the [Plaintiff] was working before the June 2018 alleged onset date," as well as "problems with coworkers," and asserts that the existence of such symptoms after the onset date does not show an inability to engage in substantial gainful activity.  (AR 34) (citing AR 386, 393, 395, 402, 408, 410, 418, 421, 423).

The Ninth Circuit, when discussing Social Security Ruling ("SSR") 83-20 (since replaced by SSR 18-01p) has explained that "sometimes, the onset of disabilities occurs all at once, and the date of onset is clear.  For example, when a claimant is permanently injured in a car wreck, there is rarely a dispute over the date of the crash.  But sometimes conditions build slowly over time." *Diedrich v. Berryhill*, 874 F.3d 634, 639 (9th Cir. 2017).  Thus, "[d]ifficulty in determining the disability onset date may arise in the case of slowly progressing conditions, including mental impairments."  *Sanders v. Astrue*, No. 2:09-CV-01021 KJN, 2010 WL 3715139, at *3 (E.D. Cal. Sept. 16, 2010).

Here, a review of the transcript, including those records cited by the ALJ, reflects that Plaintiff's alleged mental impairments may be of this "slowly progressive" type.  For example, in a record from January 16, 2018, and cited by the ALJ, Plaintiff reported increased anxiety and stress that affected his work performance "to the point where he has been talked to," and asked whether Dr. Thompson would consider putting him on leave.  (AR 418).  In a record from April 24, 2018, and cited by the ALJ, Plaintiff reported that he had high levels of anxiety, worsening paranoia, fear, suicidal ideation, poor sleep, and found it difficult to go to work and maintain his work schedule. He provided that he was requesting time off work, as recommended by Dr. Thompson.  (AR 393). Indeed, it could be that Plaintiff's impairments were potentially disabling prior to his ceasing work, or that they significantly worsened after a certain point in time.  In light of these unexamined and unacknowledged possibilities, the ALJ does not provide substantial evidence to support his assertion that evidence of Plaintiff's alleged impairments prior to his ceasing substantial gainful activity necessarily establishes that Plaintiff retains the ability now to engage in such activity.

///

### iv.    *Lack of Structure*

The ALJ assesses that "some of [Plaintiff]'s issues seem to result from lack of structure after he stopped working," citing notes from a clinical visit in October 2018.  (AR 34) (citing AR 523).  The treatment note cited by the ALJ was completed by Michael C. Llach, a marriage and family therapist working with Plaintiff at the same medical office as Dr. Thompson.  The note is dated October 5, 2018, and states, in pertinent part: "Patient reports experience of lethargy and signs of apathy.  Reports that he feels he's getting little done during the day.  Examined ways to organize day and schedule tasks, exercise and activities to better focus energy during the day … Noted that he's experienced feelings of emotional instability that he attributes to not having his day structured by work."  (AR 523).

For these observations, Plaintiff contends that the ALJ is "playing doctor" as there is no assessment by Dr. Thompson that "lack of structure" is the cause of Plaintiff's psychological limitations.   (Doc. 14 at 14).   Defendant counters that Plaintiff's own treatment provider documented that Plaintiff's feelings of emotional instability result from not having his days structured by work and that, thus, Plaintiff's own statement contradicts Dr. Thompson's opinions as to limitations.  (Doc. 19 at 7).

The ALJ cites no additional records for the proposition that some of Plaintiff's issues appear to result from lack of structure after he stopped working.  The one record cited by the ALJ to support this proposition is a therapist's recording of Plaintiff's feelings expressed in a single appointment.  On this anecdotal record without reference to any medical findings by a medical professional, the ALJ's conclusion is not supported by substantial evidence.  *See e.g., James B. v. Comm'r of Soc. Sec.*, No. C19-1298 TLF, 2020 WL 6708079, at *2 (W.D. Wash. Nov. 16, 2020) ("An ALJ 'cannot simply pick out a few isolated instances' of medical health that support his conclusion, but must consider those instances in the broader context … Plaintiff endorsed mild mental health symptoms on the one occasion the ALJ cited.  But plaintiff endorsed moderate and more substantial symptoms on multiple other occasions.  The ALJ thus erred in rejecting plaintiff's allegations of mental impairment based on his receipt of minimal treatment and endorsement of only mild symptoms.") (citing *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016)).

1      Notably, as discussed further below, the record evidence shows a far more complex picture

2  than Plaintiff' single expression, as cited here by the ALJ.

3               ***v.*      Improvement in Symptoms***

4      The Ninth Circuit has cautioned that, "[a]s we have emphasized while discussing mental

5  health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane

6  in the course of treatment.  Cycles of improvement and debilitating symptoms are a common

7  occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of

8  improvement over a period of months or years and to treat them as a basis for concluding a claimant

9  is capable of working." *Garrison*, 759 F.3d at 1017 (citing *Holohan v. Massanari*, 246 F.3d 1195,

10  1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall

11  diagnostic picture he draws.  That a person who suffers from severe panic attacks, anxiety, and

12  depression makes some improvement does not mean that the person's impairments no longer

13  seriously affect her ability to function in a workplace.")).

14               *a.  Haldol*

15      In asserting that neither of Dr. Thompson's opinions address Plaintiff's improvement in

16  symptoms after starting Navane in December 2018, the ALJ misstates Plaintiff's conditions while

17  taking the Haldol medication.  The ALJ states that, "[w]hen Navane was unavailable, the [Plaintiff]

18  continued to do well on Haldol."  (AR 35) (citing AR 1503, 1548).  However, as summarized

19  below, the record is considerably more mixed regarding Plaintiff's conditions while on Haldol.

20      The first records cited by the ALJ indicate that Dr. Thompson spoke to Plaintiff by

21  telephone on May 1, 2019, during which Dr. Thompson prescribed the Haldol medication at a dose

22  of five milligrams nightly.  At that time, Plaintiff conveyed that he feels paranoid, thinks people

23  are following him, wakes up in the middle of the night in panic, and has involuntary movements of

24  his mouth and tongue as well as stomach discomfort.  (AR 1501-1502).  Other records cited by the

25  ALJ, dated May 13, 2019, note that Plaintiff stated his "paranoia has significantly improved" and

26  that he "feels about as stable as when he was taking Navane."  (AR 1548).  On May 15, 2019,

27  therapist Michael Llach records that Plaintiff reported "some general improvement after [] recent

28  declines in functioning" and that "medication changes have been hard for [Plaintiff] to manage.

1    Feels new medications are finally adjusting. Complains of residual anxiety and paranoia." Plaintiff

2    also "complain[ed] of involuntary physical symptoms such as fatigue and involuntary

3    mouth/tongue movement. State[d] the problems [are] lessening, but persists at less severe degree."

4    Plaintiff's mood was recorded as anxious, depressed, congruent, constricted, and blunted. (AR

5    1559-1560).

6         On May 24, 2019, Plaintiff reported to Sylmar Medical Offices that he is starting to feel

7    more paranoid and has more involuntary movements, including hand tremors and tongue and mouth

8    movements, while taking Haldol at a dosage of a half portion of a five-milligram tab. (AR 1655).

9    On June 4, 2019, Plaintiff reported that he was still feeling paranoid ever since he "went down to

10   one pill per day." Plaintiff provided that his paranoia has gotten worse and that he thinks his work

11   is following him and out to get him. At that time, Dr. Thompson assessed that Plaintiff should

12   return to Haldol five milligram tabs, with one-fourth tab of "QAM" and one tab of "QHS." (AR

13   1676-1677).

14        On June 17, 2019, records note that Plaintiff conveyed that he had been irritable, with low

15   mood and poor sleep, and his mind was "all over the place, cannot concentrate," with anxiety,

16   increasing paranoia, and the feeling his employer is out to get him. (AR 1700). On June 28, 2019,

17   Plaintiff reported continued paranoid ideation that his employer is monitoring his house from

18   various cars parked on the street. He noted worsened fatigue and memory and felt Haldol had

19   helped his paranoia and tremors. (AR 1746). On August 7, 2019, Plaintiff reported feeling "more

20   subdued than usual," concerned over his mother's health and his finances due to his medical

21   benefits being cut, as well as anxious due to delays regarding his approval for use of benefit through

22   Kaiser. He was noted as in a "depressed, apathetic mood." (AR 1831-1832). On September 12,

23   2019, Plaintiff reported mild paranoia due to thinking he is being monitored, and an otherwise

24   neutral to good mood. He complained of worsening concentration. (AR 1912).

25        On December 3, 2019, Plaintiff reported a general sense of stabilization of symptoms and

26   being less paranoid, with medications helping. (AR 2115). On December 31, 2019, Plaintiff

27   reported that he felt more depressed and paranoid, as if someone was watching and following him,

28   and felt like crying, with involuntary mouth movements, dry mouth, and increased tremors. (AR

17

1    2212).  Plaintiff reported similar symptoms on January 3, 2020.  (AR 2245).

2                                      *b.  Navane*

3          Plaintiff switched from Haldol back to Navane in or about mid-January 2020.  (AR 2484).

4    The ALJ states that, once Plaintiff restarted Navane, he reported "improved mood and very minimal

5    paranoia."  (AR 35) (citing AR 2504).  The ALJ notes that Plaintiff spent more time outside his

6    home, caring for the yard, exercising, and going to restaurants, as well as visiting an aunt in

7    Phoenix.  *Id.*  The ALJ cites a mental status examination in January 2020 showing no "abnormalities

8    with behavior, manner, or appearance, normal speech, a euthymic mood and congruent affect,

9    logical and linear thought process, no suicidal ideation, grossly intact memory and concentration,

10   and the claimant was alert and oriented to person, place, time, and situation, had good insight,

11   unimpaired judgment and impulse control."  *Id.* (citing AR 2505).  However, as set forth below,

12   the ALJ's conclusions again oversimplify the more complex reality reflected in the record.

13         On January 30, 2020, Plaintiff reported an improved mood and a reduction to a very

14   minimal amount of paranoia, as well as mild tremor in his hands and resolution of drooling.  (AR

15   2504).  However, treatment notes from February 26, 2020, state that Plaintiff reported "worsened

16   mood and mild bilateral tremor for past [two] weeks.  He denies changing medications or dosages,

17   denies starting new medications or supplements. He denies any worsening paranoid ideation."  The

18   notes indicate that Plaintiff reported feeling more irritable and depressed, and having low energy.

19   Plaintiff's Navane was increased to eight milligrams nightly.  (AR 2744).  On March 12, 2020,

20   Plaintiff reported a "general sense of stability" and noted that his tremor is unpredictable.  He stated

21   that he has "good days and bad."  He provided that he is less paranoid and better able to recognize

22   the paranoia and counter fearful thoughts.  Plaintiff was noted as "[t]remulous in this session" with

23   an "anxious, concerned" mood, while cooperative and attentive to interventions.  (AR 2816).

24         On April 16, 2020, Plaintiff reported improved control of his paranoia but complained of

25   poor memory and difficulty completing tasks, as well as continuing hand tremors and onset of

26   drooling.  Plaintiff noted a benefit from distracting himself by doing projects around the home.

27   (AR 2865).  The following day, in what appears to be the most recent record in the transcript,

28   Plaintiff reported "generally adequate coping" with COVID-19 restrictions, elevated concerns for

1  his mother due to pulmonary problems, limited social contact outside of telephonic exchanges with

2  out-of-state family, and with symptoms largely under control.  (AR 2887).

3         The ALJ cites to a small number of records in support of his portrayal of Plaintiff's continual

4  and significant improvement.  However, the record reveals a far more complex reality.  Plaintiff's

5  symptoms wax and wane, with improvement in one domain often accompanied by a worsening of

6  another.  The most recent records do appear to show what may be an overall improvement as to

7  paranoia but accompanied by difficulty with tremors, memory, concentration, and mood.

8  Additionally, the record does not show this improvement in paranoia to be a longstanding trend

9  but, rather, a relatively recent phenomenon following a period where Plaintiff struggled with

10  paranoia.  *See Garrison*, 759 F.3d at 1018 ("Rather than describe Garrison's symptoms, course of

11  treatment, and bouts of remission … the ALJ improperly singled out a few periods of temporary

12  well-being from a sustained period of impairment … the data points [ALJs] choose must in fact

13  constitute examples of a broader development … .").

14         Thus, the ALJ failed to provide substantial evidence to support discrediting Dr. Thompson's

15  opinion based on Plaintiff's improvement in symptoms.

16                *vi.*    *Daily Activities*

17         In discounting Dr. Thompson's opinions, the ALJ provided that "the record reflects the

18  claimant spending more time outside his house and caring for the yard, fixing a drawer, going out

19  to restaurants, exercising regularly, and noting that he is usually active and completes different

20  projects around the house.  Moreover, in January 2020, he and his mother visited his aunt in

21  Phoenix."  (AR 35) (citations omitted).  A review of the record, however, does not evidence any

22  inconsistency between Dr. Thompson's opinions and Plaintiff's daily activities.

23         Plaintiff's activities are both built around his mental impairments and limited to largely low-

24  stress environments.  Dr. Thompson opines that "sedation" and "fatigue" are negative side effects

25  from medications that may affect Plaintiff when working.  He further noted that Plaintiff had a

26  "marked" limitation in "[i]nteracting with others," "[c]oncentrating," "[p]ersisting," and

27  "[m]aintaining pace" as well as in "[a]dapting in the workplace" and "[m]anaging oneself in the

28  workplace."  (AR 329).  Dr. Thompson provided that Plaintiff's neurocognitive disorder is chronic,

1   serious, and persistent and that, despite Plaintiff's diminished symptoms, Plaintiff has only

2   marginal adjustment, meaning a minimal capacity to adapt to changes in his environment or

3   demands not already a part of his daily life.  (AR 330).

4       Though Plaintiff engages in some limited daily chores, hobbies, and social interactions, the

5   record shows he relies on his mother as caretaker and structures his activities around his

6   impairments.  (AR 58-61).  As such, the ALJ erred in discounting Dr. Thompson's opinions based

7   on Plaintiff's daily activities.  *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014)

8   ("Although Ghanim performed some basic chores and occasionally socialized, the record also

9   reveals that he relied heavily on his caretaker, struggled with social interactions, and limited himself

10  to low-stress environments … Ghanim's limited daily activities are not in tension with the opinions

11  of his treating providers.").

12      In sum, the ALJ erred in discounting the opinions of Dr. Thompson, and thereby not

13  incorporating them into the MRFC, by failing to provide substantial evidence to support his

14  analysis.

15  **B.  Whether the ALJ Harmfully Erred by Failing to Provide "Clear and Convincing"**

16      **Reasons to Reject the Symptomology Evidence of Record**

17      The ALJ's error in discounting Dr. Thompson's opinions is enough to warrant remand of

18  this action.  However, the Court will briefly address the ALJ's analysis of the symptomology

19  evidence of record, particularly as the ALJ employs similar reasoning when rejecting it.

20      Before the ALJ discredits a claimant's subjective symptom testimony, they must first

21  determine if objective medical evidence of an underlying impairment "could reasonably be

22  expected to produce the pain or other symptoms alleged."  *Trevizo v. Berryhill*, 871 F.3d 664, 678

23  (9th Cir. 2017).  The ALJ found this was the case.  (AR 31).  The second step is for the ALJ to

24  describe specific, clear, and convincing reasons to reject the claimant's testimony on the severity

25  of his symptoms.  *Trevizo*, 871 F.3d at 678.

26      Indeed, accounts of Plaintiff's psychological conditions, and corresponding prescribed

27  medications, exist throughout the record.  (*See*, *e.g.*, AR 393, 1501-02, 1559-60, 1655, 1676-77,

28  1700, 1746, 1831, 1912, 2212, 2245, 2744, 2816, 2865).  That, along with his testimony during the

1    hearing regarding his symptoms (AR 55-64), establishes for the ALJ a duty to discuss Plaintiff's

2    impairments and resulting subjective symptom testimony and, if the ALJ finds such testimony

3    should be rejected, the ALJ must describe his reasons with specificity under the relevant clear and

4    convincing standard. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir.2006) ("[U]nless

5    an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only

6    find an applicant not credible by making specific findings as to credibility and stating clear and

7    convincing reasons for each.")

8         While the Court may be able to draw inferences about what testimony may be inconsistent,

9    the ALJ must identify those inconsistencies with specificity. *Lambert v. Saul*, 980 F.3d 1266, 1278

10   (9th Cir. 2020) (citing *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015)) ("Although the

11   inconsistencies identified by the district court could be reasonable inferences drawn from the ALJ's

12   summary of the evidence, the credibility determination is exclusively the ALJ's to make," and the

13   reviewing court is "constrained to review the reasons the ALJ asserts.").

14        Plaintiff asserts that the ALJ summarized Plaintiff's testimony in one portion of the decision

15   (AR 31) and analyzed it in one paragraph in his decision (AR 32). (Doc. 14 at 17). As to this,

16   Plaintiff is partially correct. The ALJ does primarily analyze the symptomology evidence of record

17   on page eight of his decision (AR 32) but also engages in some analysis on page nine (AR 33).

18   Plaintiff argues that the ALJ did not provide "clear and convincing" reasons to reject the

19   symptomology evidence of record, in that he "cherry-pick[ed] findings of daily activities" (Doc. 14

20   at 17-18), failed to discuss Plaintiff's "residual paranoia" (*id.* at 18), confused the issue of whether

21   Plaintiff can physically perform minor projects at home with whether Plaintiff has the "mental

22   bandwidth to independently sustain basic work activity" (*id.*), and failed to "link any of Plaintiff's

23   testimony with any specific medical evidence of record that the ALJ believe[d] to be inconsistent"

24   (*id.* at 19-21).

25        Defendant asserts that the ALJ properly found that the objective medical evidence did not

26   support Plaintiff's symptomology claims and limitations. (Doc. 19 at 9). Defendant provides that,

27   in addition to citing Plaintiff's unremarkable medical exams, the ALJ validly considered Plaintiff's

28   daily activities and treatment history. *Id.* at 10. Defendant argues that, though Plaintiff's activities

1    could be interpreted more favorably to him, the ALJ's interpretation was reasonable and, therefore,

2    must be upheld. *Id.* (citing *Burch v. Barnhart*, 400 F.3d 676, 681-82 (9th Cir. 2005)).

3        An ALJ properly may consider a claimant's activities of daily living in assessing the

4    claimant's testimonial credibility.  Specifically, "if a claimant engages in numerous daily activities

5    involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's

6    allegations upon making specific findings relating to those activities." *Burch*, 400 F.3d at 681; *see*

7    *Morgan*, 169 F.3d at 600 (finding that claimant's ability to fix meals, do laundry, work in the yard,

8    and occasionally care for his friend's child was evidence of claimant's ability to work).  Daily

9    activities may be grounds for an adverse credibility finding if a claimant is able to spend a

10   substantial part of his day engaged in pursuits involving capacities that are transferable to a work

11   setting. *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012), *superseded on other grounds*

12   *by* 20 C.F.R. § 404.1520c *et seq*.  When discounting a claimant's credibility on the grounds of

13   inconsistencies between his testimony and activities of daily living, an ALJ must explain "*which*

14   daily activities conflicted with *which* part of [c]laimant's testimony." *Burrell v. Colvin*, 775 F.3d

15   1133, 1138 (9th Cir. 2014) (emphasis in original).

16       Though inconsistent daily activities may provide a justification for rejecting symptom

17   testimony, "the mere fact that a plaintiff has carried on certain daily activities ... does not in any

18   way detract from her credibility as to her overall disability." *Benecke v. Barnhart*, 379 F.3d 587,

19   594 (9th Cir. 2004) (alteration in original) (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th

20   Cir. 2001)).  A claimant "does not need to be 'utterly incapacitated' in order to be disabled." *Id.*

21   (quoting *Vertigan*, 260 F.3d at 1050).

22       The case of *Ochoa v. Astrue*[2] is instructive.  In *Ochoa*, the court held that, where Plaintiff

23   "exercises five hours per day to reduce his panic attacks by walking, hiking, and riding his bike …

24   takes his son and daughter to and from school, [] cleans the kitchen, [] shops, [] attends church, and

25   [] does yard work," the ALJ erred in discounting his credibility as Plaintiff's anxiety and lack of

26   concentration impaired his mental ability to control anxiety levels and maintain focus.  The court

27   further noted that "any work setting of substantially gainful activity requires a continuous pace of

28

---

[2] No. CV08-00044-SH, 2009 WL 1769319 (C.D. Cal. June 22, 2009).

1    productive output" which Plaintiff's mental impairment precludes.  *Ochoa*, 2009 WL 1769319, at

2    *14.

3         Here, in his decision, the ALJ focuses heavily on Plaintiff's daily activities when

4    discounting his symptomology testimony.  The Court notes that the ALJ's reasoning in discounting

5    the symptomology testimony, as well as his citations to the record, are substantially similar to the

6    daily activities and citations referenced by the ALJ when discounting Dr. Thompson's opinions.

7    As such, the ALJ's reasoning fails for the same reasons as explained above in subsection A, subpart

8    (vi).

9         Where the ALJ does provide other reasons to discount symptomology testimony, such as

10   referencing Plaintiff's mood and response to medication (AR 33), his reasoning fails for the same

11   reasons as explained in subsection A, subpart (v), regarding the ALJ's mischaracterization of the

12   record as to Plaintiff's response to medication and treatment.

13        It follows that the ALJ failed to provide clear and convincing reasons to reject the

14   symptomology testimony of record.  *See A.Z. v. O'Malley*, 711 F. Supp. 3d 1106, 1111 (N.D. Cal.

15   2024) ("[Plaintiff] noted: 'I have a bad memory and depression and sleeping disorder and [PTSD]

16   and I hear voices.'  Though such evidence is arguably subjective, the ALJ was not permitted to

17   discount it for that reason alone … the record contained objective evidence from before 2015 of

18   A.Z.'s depression, as well as recent agency reports noting that she had a depressed mood and

19   congruent effect, all of which corroborated her testimony.").

20                    *        *        *        *        *

21        In sum, the ALJ failed to provide substantial evidence to discredit Dr. Thompson's opinions

22   and did not meet the applicable clear and convincing standard in rejecting Plaintiff's psychological

23   symptomology, where the record shows consistent diagnosis of serious mental impairments, with

24   multiple medications prescribed, over the course of many years.

25        The decision whether to remand for further proceedings or simply to award benefits is

26   within the discretion of the Court.  *See Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990).

27   Remand for further proceedings is warranted where additional administrative proceedings could

28   remedy defects in the decision.  *See Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984).  Remand

1  for the payment of benefits is appropriate where no useful purpose would be served by further

2  administrative proceedings (*Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980)); where the

3  record has been fully developed (*Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986)); or

4  where remand would unnecessarily delay the receipt of benefits to which the disabled Plaintiff is

5  entitled (*Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985)).

6       Here, Plaintiff seeks an order from the Court remanding this case for further administrative

7  proceedings (Doc. 14 at 21) and the Commissioner argues that the Court should affirm the ALJ's

8  decision finding Plaintiff not disabled (Doc. 19 at 11).  The Court concludes that remand for further

9  proceedings is warranted because additional administrative proceedings may remedy the

10  deficiencies in the ALJ's decision noted herein.

11  **IV.    CONCLUSION**

12       For the reasons set for above, the Court finds the ALJ erred in evaluating opinions in the

13  record and failed to apply the proper legal standards.  Accordingly, IT IS HEREBY ORDERED

14  that:

15    1.  Plaintiff's motion for summary judgment (Doc. 14) is **GRANTED**.

16    2.  This matter is **REMANDED** pursuant to sentence four of 42 U.S.C. §405(g) for further

17       proceedings consistent with this decision; and

18    3.  The Clerk of the Court is **DIRECTED** to enter judgment in favor of Plaintiff David Pryor

19       and against Defendant Commissioner of Social Security.

20  IT IS SO ORDERED.

21  Dated:  __**March 28, 2025**__

22                               UNITED STATES MAGISTRATE JUDGE